This is case number 4-13-0483, Jared Blair v. Pennell Forklift Service. Attorney Tappell is here on behalf of the appellant. Attorney Unrath is here on behalf of the appellee. Mr. Tappell, are you ready to proceed? I am, Your Honor. All right, you may proceed. Thank you. May it please the Court, may it please the Council, my name is William Tappell and I am here for both Jared and Corey Blair. We have put before this Court two issues. First, whether the trial court erred in its grant of summary judgment for the appellees, and quite obviously we believe the trial court further erred in its denial of summary judgment on our motion for summary judgment with regards to the issue of duty and the breach of that duty. In addressing my oral arguments, I'd like to cover three points on those topics. First, the application of section 324A of the restatement of tort second, and within that I would like to particularly address the scope of duty issues that appear prominent in the appellee's brief. Second, I would like to address the duty issue in the terms of a traditional analysis that courts are required to consider for the establishment of a duty for the defendant. And finally, I want to address the proximate cause issue, which we assert appears for the first time on this appeal. With regards to duty by voluntary undertaking, the Court is well aware from the briefs that the Illinois Supreme Court has adopted section 324A. And the principal challenge to the application of the voluntary undertaking doctrine, as it is known, is the scope of the duty at issue in this particular case. The appellee urges at the trial court level and before this court that the scope of the duty at issue here is specifically defined by the contract at issue and excludes testing for carbon monoxide. The appellee is wrong for two reasons. First, under each of the court cases cited by either side in this matter, the scope of the voluntary undertaking is defined precisely by what did the defendant undertake to do for the plaintiff. In many cases, particularly those with integration clauses, that is in fact defined by the contract itself. In this case, if the definition of the voluntary undertaking is limited to the contract itself, that contract includes two documents. Everybody who testified on the issue agreed. It includes the contract itself, which is at page 16 in the record, and the preventative maintenance checklist, which is at page 17 in the record. On the preventative maintenance checklist, the contract specifically noted that emissions from a propane-powered forklift, which is specifically called out in the agreement, would be checked by Pinell. Under operational checks, exhaust emissions, everyone who testified said the emissions are what comes out of the tailpipe. Everybody testified that with this machine, that included carbon monoxide, which is a deadly gas. Mr. Crippen, who signed on behalf of Fastenal in this case, and each and every employee for Pinell who testified, including the sole shareholder of that company, Mr. Pinell, testified that no one explained to Crippen that there was any limitation on the definition of emissions or that the test of emissions would be limited to avoid a test for a known deadly gas. Those conversations did not happen. Under the circumstances of this case, I don't think that ends the analysis, because the scope of the... Who did you say testified that the contract in the preventative maintenance checklist provided for carbon monoxide emission testing? Who testified to that? I didn't say carbon monoxide. I said it calls for emissions. And when you look at the preventative maintenance checklist, Justice, there is a specific line that says exhaust emissions. Jeff Pinell, Jim Qualls, Patrick Heist all testified that the exhaust is the mechanics that carry fumes away from the engine, and the emissions are what comes out of the tailpipe. They all testified that that includes carbon monoxide. They all testified that they knew carbon monoxide was a deadly gas, and they all testified that no one explained to anyone at Fastenal that when they said they were going to check emissions, that did not include a check for carbon monoxide. In fact, addressing that issue... But do the documents provide for carbon monoxide emission testing? Isn't that the question? Yes, and it is our position that where they say they are going to check emissions, that is precisely what it's called for. And if I may add, to the extent that you or the other Justices may have doubts about that, if we find that the term emissions may somehow be ambiguous, if you will, as to what was to be tested, we need look no further than the testimony of Mr. Pinell himself. At page C-1005 of your record, he testified about what he told Rick Crippen at Fastenal about this testimony. He said, and I'm quoting, basically I assured him that we will always do what's right and maintain his equipment just as we do our own. Just as we do our own. And he received a copy of this and this, which in subsequent questions were clarified to be the contract and the preventative maintenance checklist. We then followed up at page C-1002 of the record before this Court, and he was specifically asked, what do owners do to their own equipment? And I asked him, I said, if you would agree that when a propane forklift is being operated indoors, it is particularly important to monitor CO emissions, correct? He said, absolutely, by the owner of the forklift. And again, in the context of a Pinell-drafted contract, they wrote this document that represented to Fastenal that emissions were going to be checked, and when the only statements made to Fastenal outside the four corners of that document were, we're going to do what's right and we're going to treat it like it was our equipment, and where Mr. Pinell admits that owners have an obligation to check, he goes on to testify, by the way, that his company can be assigned that obligation and that he recognizes that, It is clear, I believe, from the four corners of the document, but to the extent any interpretation of that document is required, that CO emissions were absolutely a part of the emissions check that was to be conducted under the Preventative Maintenance Agreement. If I may continue, when we look at the other elements of Section 324A, I believe this becomes even clearer. We know that Pinell undertook, in this case, for consideration the rendering of services, which was, in fact, in this case, the preventative maintenance work that is called for on that checklist. The next question is, should they have recognized the risk associated with providing services? And we interviewed two of the service techs that were involved with this machine. We know that Mr. Qualls, at C1093 of your record, knew that carbon monoxide caused death. He knew that it was odorless, it was tasteless, it was colorless, it was non-irritating to the skin. Again, that's at C1099 of the record. He agreed that it's particularly dangerous in an indoor environment, and he agreed that a person could be exposed to that gas without knowing it. Mr. Heiss, the lead technician for Pinell, testified that this was a machine without a catalytic converter, that a catalytic converter reduces emissions by 70 to 90 percent, and that this machine, without the catalytic converter, was at a higher risk, a greater propensity, if you will, to emit the deadly gas. If they satisfied the three alternate criteria under 324A, and they satisfied all of them, then a duty exists under the 324A analysis adopted by our courts in Illinois. Those three alternatives are the failure to exercise reasonable care, increase the risk. I've just covered why that's so. This is a deadly gas, a machine without a catalytic converter, being used in an indoor environment, emitting an odorless, tasteless, colorless, non-irritating gas that the workers could not possibly detect absent appropriate testing. Pinell undertook this to perform a duty owed by the other to the third person, the other fascinal, owed a duty to provide a safe workplace. By not performing that duty, Jared Blair was at greater risk of injury. We know that Rick Crippen testified at C-974 that he wanted the preventative maintenance program to protect his employees from a risk of harm. We know at 976 he testified that the preventative maintenance checklist, he assumed that exhaust and emissions would be checked in a manner to protect his employees, and at C-977 he testified that he relied on Pinell to check those emissions. The final alternative is that the harm suffered is because of reliance of the other or a third person upon the undertaking. The appellee goes to great lengths in their brief to mock or chastise Jared Blair's lack of knowledge about forklifts. They're right. He knew nothing about forklifts. Neither did Rick Crippen, nor did anybody else at Fascinal. They relied entirely upon Pinell to provide the safety checks. In further response to your earlier question about did it require this, each of the technicians testified that this preventative maintenance check was to assure that the machine was operating safely and appropriately.  Okay, needs adjustment, needs repair, and a place to make a note on that same sheet. Under exhaust and emissions, it was checked as okay. This is not just a failure to test or a failure to warn of the need for testing, all is alleged in our complaint, but it is a direct representation that we did check and that these emissions were okay when in fact they were not. Didn't Crippen testify that he didn't ask for them to do a carbon monoxide test and that he knew if they did one, he'd have to pay a fee for it? No, Your Honor. In fact, I think that is one of the, that language is quoted, but if you read the quote carefully in the appellee's brief or in the actual testimony itself, the question said, after the exposure, did you request and did you receive and did you pay for the carbon monoxide testing? It does not prove that at the time of the formation of this contract, at the time the duty was established, at the time of the negligent conduct at issue, that he knew that. It simply establishes that once he found out his employees had been exposed to a deadly gas, these ratings, again, were ten times over the OSHA allowed limits. They had called out the fire department. They had opened all the doors. They had closed the shop. And he calls Pinnell and says, hey, I've got a problem. Get out here and please check this corridor. And for the first time at that point in time, Jeff Pinnell says, oh, yeah, there will be a charge for that. At no point prior to that date, and it's the testimony from Pinnell, all agents of Pinnell, at no time prior to that did anybody explain to anyone at Fastenal that there is any limitation on the testing that will be done. They also make the argument, Your Honor, that because a wand is necessary, that somehow this takes it outside the scope of the contract. Simply not true. Read the testimony of Heiss, Pinnell, and Qualls. Each one of them testified that to check the safety of the chains, they used a small plastic gauge to do the preventative maintenance. That when they had to check the starter or other pieces of equipment that my non-mechanical mind did not always follow, that they had to use a voltmeter or some other type of gauge. So gauges were used during the course of this. One of the other quotes of Mr. Kriven is that he recognized that a wand wouldn't be used. I think what the actual quote is, you agree that nowhere in the document does it say we'll use a wand. No, but it doesn't say we're going to use a plastic gauge to check chains. It doesn't say we're going to use a voltmeter to check the starter. It doesn't say how we're going to conduct any of the items on the checklist. That doesn't excuse Pinnell from conducting a test or giving some fair warning. Hey, we're not checking for the deadly gas that's coming out the tailpipe of that machine. You need to either pay us more or you need to go hire somebody to make that check. Those things were never given. Those facts are uncontroverted. They are well-pled in our complaint. And so those characterizations of Mr. Kriven's testimony, Your Honor, I would suggest are misleading and an incorrect statement of what he actually said, and I would urge the court to conduct a careful reading of those in the context of the facts of this case. I am fast running out of time. There's so much to say. And so let me touch on traditional analysis of duty by the courts in this state. And as you are well aware, there are four factors that courts should consider. And I will say that in reading the appellate court and Supreme Court case law on this issue, it's interesting because you see the courts apply the 324A analysis, and you see some courts apply traditional duty analysis, and you see some courts apply both, but there is never a clear statement in the case law as to whether or not 324A entirely supplants traditional duty analysis or not. I don't think it matters in this case because I think the duty is clearly established in either direction. With regards to those four factors, we have reasonable foreseeability of injury. We have the likelihood of injury. We have the magnitude of the burden of guarding against the injury. And we have the burden placed on the defendant by imposing that duty. I believe I've addressed those first two factors at length, the knowledge that these folks had of the significant risk posed by this very deadly gas. So I want to spend just a moment talking about the magnitude of the injury and say this. It is de minimis. We're talking about human lives, serious injuries versus three options. Take emissions off your contract if you're not going to check. Give a warning to the people that are going to be exposed to that deadly gas if you're not going to check it. Or, as the deposition testimony clears, take the wands that you had in your building, stick one down the tailpipe, and look at the computer and find out whether it's safe or not. How much of a burden would that be? They owned the wand, sir. It was available to these technicians. It takes minutes to conduct in a preventative maintenance testing program that takes an hour and a half to two hours. Sounds like a reasonable argument. Did you make that to the trial court? Oh, certainly. Where did the trial court say you wrote that argument? I'm sure you've read his opinion. I have no idea. Let me touch very briefly, if I may, before my time expires, on proximate cause. It simply was not raised in the trial court. There was never an argument on proximate cause. We never had that opportunity to address it. I want to be clear. We had not yet had a deadline for the disclosure of experts set in that case. We had experts retained. They'd never been disclosed. And there was no need to do it here where proximate cause was not raised. The testimony is conflicted. They say Gerard's symptoms didn't start until after May. You have Gerard's testimony and you have Dr. Allen's testimony that demonstrates his symptoms started in March and April prior to this. And most importantly, you have the testimony of Mr. Heiss, their mechanic, who testified that this was not an overnight problem. At C638 through 639, he testified that this had been going on for months. Thank you for your questions and your attention. Mr. Andre? Good afternoon. My name is Craig Unrath, and I represent the Penal Forklift Service Council. The forklift was in use at this Fastenals facility for four years prior to the injury. Prior to that time, there had been no complaints of any exposures to carbon monoxide. Four years without any report of injury. Now, in May 2008, Penal Service, the forklift, three months later, more than three months later, on August 25, 2008, Plaintiff Blair was diagnosed with exposure to carbon monoxide. Now, the critical question in this case, on a very fundamental basis, is whether the forklift was emitting carbon monoxide at the time that Penal serviced it in May 2008. Because if it was not emitting carbon monoxide on acceptable levels on that date, then there is no causal connection between Penal's conduct and Blair's injury. Blair has come forward with absolutely no evidence to support an inference that the forklift was emitting unacceptable levels of carbon monoxide. This sounds like a fact question. We're dealing with a summary judgment, aren't we? This is true, and proximate cause is normally a question of fact for the trier of fact. However... Are you conceding there was a duty? Absolutely not, Your Honor. I was going to address that in the second part of my argument. Where there has been no affirmative showing of proximate cause, the issue becomes a question of law, and summary judgment is appropriate. Now, on page 18 of their brief, Plaintiff contends that the Penal technician told him that the defective carburetor had been defective for quite some time. We looked into that. The citation is to Mr. Blair's own testimony. Let's look at the testimony of the technician himself, who actually repaired this. We asked him, as a matter of fact, Plaintiff's counsel asked the technician who repaired it. He said, how long had this been going on? And he replied, he said, it's a wear and tear item. There's no way of saying. He said, do you have any idea whether or not it was... Do you know when it began to emit carbon monoxide? He said, no, there's no way of knowing. So right there, what we have is a situation where any suggestion, any claim that the forklift was emitting unacceptable levels of carbon monoxide in May 2008 is entirely speculative based on conjecture. That carburetor could have worn out at any time. For four years, it had operated in that facility without any reports of injuries. Now, I'd like to also refer directly to Mr. Blair's testimony. We asked if he had any information indicating that the forklift was emitting dangerous amounts of carbon monoxide prior to September 2008. He testified that he had none. And that's at page 1244 of the common law record. He testified that as of May 19th, he hadn't had any health problems. That's at page 1215. He also testified that he could not say whether the forklift was emitting inappropriate amounts of carbon monoxide on May 19th and conceded that it could have started doing so a month or so after Pennell had serviced the forklift. That's at page 1216 of the common law record. To my mind, that is dispositive. There's no further question here. There's really no need to even go further. We have absolutely no evidence that this forklifting question was emitting unacceptable levels of carbon monoxide. At that point, you couldn't draw a reasonable inference that it was emitting carbon monoxide at the time it was tested? I'm sorry, Your Honor. Could a fact finder find a reasonable inference that it was emitting more carbon monoxide at the time it was tested? No, I don't believe they can. Why not? And counsel just made reference to a number of symptoms that Blair had experienced prior to the May inspection of the forklift. However, we attached to his response to our motion for summary judgment, he included the deposition of his physician, Dr. Coughlin. Dr. Coughlin gave a very detailed medical history. Mr. Blair had problems with pneumonia, mycoplasma pneumonia, and a number of other issues. And he said on August 28th, though, he said that's when it changed. That's when he really had symptoms of carbon monoxide. And they said, well, what about all the prior problems? And he said, those are separate. He said, those are related to the pneumonia. They're not related to carbon monoxide exposure. So we know for a fact by his own physician's testimony that he was diagnosed as of August 28th, over three months after our test. The only other evidence. Did he testify or give an opinion on the onset of such symptoms after exposure? In his medical history, he did. Which was? To Dr. Coughlin. And it was in August of 2008, well after the, and I believe that Dr. Coughlin, who had experience, specific experience with carbon monoxide poisoning from police officers, he said it was the tingling in his hands and feet. He said, that's what made the difference. That's when I knew it was carbon monoxide poisoning, and that was the first time he'd ever experienced those symptoms. I mean, when did the symptoms arise after exposure? Does that show that the exposure was in August? We know it was in August. We know it was sometime before August. We have absolutely no evidence to suggest that it was prior to Pennell's inspection of the forklift. Absolutely none. And any suggestion that it was emitting carbon monoxide is entirely speculative. The defective carburetor could have broken down on August 1st. It could have broken down on July 1st. It could have broken down on June 1st. We don't know. No one can know. It's a coin toss. There's no evidence either way. I'm not real clear on that. I think Justice Connick is asking you, once a person is exposed to carbon monoxide, what is your testimony as to when those symptoms would start showing up? Dr. Coughlin testified that those symptoms were from a recent exposure. That's all we know. But, again, we have nothing there that would establish the existence of carbon monoxide prior to May 18th. I believe I even have Dr. Coughlin's testimony right here with me. I do have Mr. Blair's testimony where he was asked. This is right from the transcript. You can't tell me, as you sit here today, that this particular forklift was emitting inappropriate amounts of carbon monoxide on May 19th, 2008. Answer, no, I guess not. I mean, it could have started doing this on June 19th, 2008, right? Answer, it could have. Most of what you said up to this point is approximate cause argument. Yes. Well, what is your response to Mr. Tappella's point that that wasn't something that appeared to be at issue? As a matter of fact, if you looked at his motion, his response to our motion for summary judgment, he has a heading, subheading, entitled, Approximate Cause Does Exist. Now, here are a couple quotes from our pleadings. These are exact quotes. Plaintiff has disclosed no witness competent to testify as to the date the carburetor failed or that the problem existed at the time Qual's serviced it in May 2008. That's on page 927, 928. Plaintiff has disclosed no evidence that would support even an inference that the forklift was malfunctioning as of May 2008. That's on page 928. And here we state, without evidence from which a jury could draw this inference, defendant is entitled to summary judgment, also on page 928. We not only have the factual details within the attachments to the memorandum of law, but we made the specific argument in our pleadings stating that summary judgment must be entered because there is no evidence other than complete speculation and conjecture that the forklift was emitting carbon monoxide as of the date of our inspection in May. Now, getting to the duty issue, over and over again we hear that Crippen, who was the, I mentioned, the president or head manager at Fastenal, he wanted the emissions checked to ensure the safety of his employees. Now, to begin with, it's important to point out that it is Fastenal's duty to ensure a safe workplace for its employees. They're supposed to test the air for carbon monoxide and they're supposed to maintain records on that. They didn't do either. There is also no evidence anywhere in the record from Crippen's testimony that he specifically asked Pennell to check CO, the carbon monoxide emissions on the forklifts, despite Blair's contention that this was a priority of his. Now, there's another aspect to this, and I don't know that this is dispositive, but I think it's persuasive. Here's a copy of the checklist. Notice how it's broken up into categories. I'm sure you've all looked at it. We've got safety, operational checklist, engine compartment check and lube, fuel system checks, emissions, carbon monoxide emissions. Now, wouldn't you think that that would fall under safety? Well, it's not there at all. Safety lists about a dozen items on there. Testing for carbon monoxide emissions is not on that list. We weren't there to perform a safety check on the emissions. If we had, we would have included it in that category. What about the line that says emissions exhaust? Isn't there a part on your form? Yes, yes, and this is under operational checks, exhaust slash emissions. All of the technicians testified, as well as Mr. Pennell, that the service tech is there to look and listen and see if anything is out of order. They're looking for blue smoke. They're looking for manifold gaskets that are cracked. They're looking at a muffler that's falling apart. They're looking for basic visual or operational tests. I think it's important to note you can't test for carbon monoxide emissions visually, obviously, and it's not part of an operational test. These guys would start up the engine, see if it ran smoothly, look to see if there's blue smoke suggesting oil burn or white smoke suggesting an antifreeze burn. They're not there to perform a safety check. Otherwise, we'd have it right there under the safety column on the checklist. They look for worn hoses. They listen for sounds, unusual vibrations, unusual smells. It comes down to this. Under the OSHA standards, it was Crippen's duty to have that facility tested for carbon monoxide and to maintain records on it. If he wanted a contract to do that testing, he would have done so. He didn't. He got this. He got a preventive maintenance check. That's not a safety check. The voluntary undertaking theory upon which this entire case is based is limited to the extent of the undertaking. We're here to do a $56 look and see to see if there's anything that this forklift is going to cease to function in the middle of their operations. They want to make sure that this thing is going to continue to run so that they can keep their business running. Well, opposing counsel argues that the burden on your client would have been very minimal. You have the wand. You could have used the wand. It only took a couple of minutes, and therefore there shouldn't be a duty imposed because the burden is so light. What's your response to that? My response is twofold. First off, the wands, the testing equipment, are not carried by every technician. It's kept at the shop. I believe they have testimony that shows that they had one or two out there. If they were called for, if a customer asked for it, the technician would bring one of them out. The other thing is this, is that the fact that it would have been easy to perform this test is just one element of the duty analysis. In the end, we're still looking at a negligence claim based on contract. And when you have a negligence claim based on contract, it is limited to the contractual provisions. It's limited to the extent of the undertaking. And as I pointed out in our brief, the Supreme Court has cautioned that this theory is narrowly construed. Now, we're going to need something on that contract that says we agreed to perform carbon monoxide testing. And there's nothing there. We're there just to see if the thing is going to run next week. And it's not ambiguous at all. We don't find it ambiguous at all. No. I think it's also essential that there's been some talk here that Crippen, or talk, I'm sorry, some statements made that Mr. Crippen specifically asked for carbon monoxide testing. Now, we take issue with that. Now, I think that what you'll find is we have some unsupported claims made by Mr. Blair that he asked for this. But in the record, if you look at it, what you'll find is that Crippen testified that he had no information to support the notion that Pennell somehow failed to live up to his service agreement. Now, that's pretty key right there. I don't have the citation to the record with me. But its support is cited in our brief. The citation is there. If Crippen expected us to perform carbon monoxide testing, don't you think he would have thought that he had grounds for breach of contract when we didn't? He didn't. He said there was no reason for a breach of contract claim. He had no reason to think that Pennell had somehow failed to live up to its side of the contract. And when Fastenal contacted Pennell, we came out, and he understood that he was going to be charged an extra charge. If he thought this was in the original contract, why did he so willingly pay for that charge? Why didn't he say, I knew that that was part of the contract. Why are you charging me for this now? He didn't say that. The reason is that he knew it was going to be an extra service. As a matter of fact, we have testimony, and I've cited this in my brief, where Crippen stated that there was nothing in the agreement which stated that carbon monoxide emissions would be tested. Nor did he expect that carbon monoxide emissions would be tested every time Pennell performed preventive maintenance. It doesn't say carbon monoxide emissions, but it does say emissions. Emissions. This is true. So wouldn't emissions include any emission, including carbon monoxide? It would make sure that the emissions system is performing correctly, that the muffler is not broken, that the manifold seals are not broken, that they do a visual inspection to see if there's blue smoke or white smoke or an odor that would suggest that there are other problems with the forklift. But there's no suggestion anywhere in this contract that they're going to actually perform carbon monoxide. Did you say that they did use the wand on other occasions there? No. Had they ever used the wand? Not at Fasenal. They had never used it before at any of their facilities. Another main point here is reliance. They claim that the Fasenal employees relied on Pennell to perform this. Council made reference to Blair's lack of knowledge of forklift mechanics, and I share that lack of knowledge. The important thing is this. It doesn't matter what he knows about forklifts. It matters what he knows about the preventive maintenance agreement. Because he can't rely on Pennell to perform this carbon monoxide testing unless he knows that that's part of the agreement. Blair testified that he had no idea what these inspections entailed. The Fasenal employees had a right to rely on their employer to make sure that they had a safe workplace. And that's under OSHA. Federal Regulation 1917.24 requires them to test for carbon monoxide, particularly when you have vehicles working in the warehouse. Fasenal never contracted with anyone ever to perform those kinds of tests. In closing, I would like to point out that the case fails on a number of different levels. In order to prevail in this case, a jury will have to presume, take a guess, that the forklift that we inspected actually could have been emitting dangerous amounts of carbon monoxide. And they have absolutely no evidence to do so. We can't encourage them to speculate. Thank you, Your Honor. I urge you to affirm the trial court's order. Thank you, Mr. Unruh. Mr. Tappella, you have rebuttal, I assume? I do. And more than I have time for. And so let me say up front, I had mentioned to counsel beforehand how difficult it must be to make an appellate argument in a case where you didn't take the depositions and you weren't present for those depositions and the testimony. And while he does an honorable job, his statements with regards to the evidence in this case, I believe, are mistaken in a number of ways. And I urge this court to give careful consideration to the actual testimony presented. On proximate cause, it was not raised, in our view, at the trial court level in a manner that put it before the court in any meaningful way or that would permit this court to make a determination. To the extent you believe otherwise, Jared Blair testified that his symptoms began in March or April. Dr. Allen's deposition, he is an expert in carbon monoxide exposure, testified that based upon a history of symptoms beginning in March and April, he believed that the carbon monoxide exposure that he addressed for Jared was consistent with the exposure that would have begun in that time frame. And we have Mr. Heiss' testimony, the lead technician for Pinnell, who testified, and again, counsel did not do this intentionally, but what Mr. Heiss actually said is, this didn't happen overnight. This was a rare item. And that is entirely consistent with Mr. Blair's testimony that this had happened over quite some period of time. As I mentioned earlier, no experts had been disclosed in this case, and given the pleadings before the trial court, there was no reason to address that issue. At worst, from our perspective, this is a fact issue that deserves consideration on the merits at the trial court level before a jury. Just to make sure, are we talking about two doctors involved or one doctor? There were multiple doctors involved. We have testimony from Dr. Michelle Mattingly, Dr. Timothy Allen. He references Dr. Coughlin, but Dr. Coughlin is not an expert in this field. Allen and Mattingly are. They were both treating doctors, not experts that we had retained. They had the advantage of looking at Coughlin's records and the symptoms that Jared was experiencing and saying, yeah, that's consistent with carbon monoxide exposure, and it would have been prior to the May examination date, that issue. Or could have been. It was consistent. I mean, these doctors have testified, yes, that's consistent with the process. The symptoms that he references in March. Yes, sir. March or April. March or April are consistent with a later diagnosis of exposure. Yes, sir. You don't dispute that the other doctor, Coughlin, said it's a more recent exposure, and I define it to, or I limit it, I'm interested in this tingling. I dispute counsel's representations concerning what occurred here in that. What Coughlin said is the symptoms I saw in August were the symptoms that I believe are consistent with carbon monoxide exposure. Okay. What these other doctors have said, we looked at Coughlin's records and the symptoms he was reporting further back are, in fact, consistent with carbon monoxide. Very quickly, the language in this contract said visual inspection where possible or operational checks. It does not limit the inspection to a visual inspection. If a visual inspection is not possible, that limitation cannot apply. Nobody told Rick Crippen, Jared Blair, or anybody else at Fastenal that when we say emissions, that we know contain a deadly gas, that we told you we were going to check like it was our own, nobody said, oh, and by the way, we're not going to check for carbon monoxide. We're not going to do the test. Recall our complaint specifically says a failure to warn that they weren't going to do the test, a failure to warn that they didn't do the test, and the negligent failure to do the test. And all of those are relevant with regards to the duty that we're talking about in this case. You can't look at that machine that you know can be deadly, make the representations that were made in this case, and blindly turn your back. The duty element is clearly established. A couple of other points. Mr. Pinnell testified this inspection was a loss leader. He did it so that he could do other repairs. If he had to charge for the use of that wand and he knew this was a dangerous condition, then the duty is to warn that it wasn't done. And, oh, by the way, I need to charge you money before people got hurt. Before people got hurt. Thank you, Mr. Pinnell. You're out of time. We'll take this matter under advisement and stand at recess. Thank you.